IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2022

## IN RE ELLIE G. ET AL

**Appeal from the Juvenile Court for Davidson County**
**No. 2018-2231, 2018-2232, PT253664    Sheila Calloway, Judge**

_____

**No. M2021-00982-COA-R3-PT**

_____

In this termination of parental rights case, Appellants, the children's biological mother and father, appeal the trial court's termination of their respective parental rights to the two children on the grounds of: (1) abandonment by an incarcerated parent by wanton disregard, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv); and (2) failure to manifest an ability and willingness to assume custody, Tenn. Code Ann. § 36-1-113(g)(14). Mother appeals the termination of her parental rights on the additional ground of persistence of the conditions that led to the children's removal, Tenn. Code Ann. § 36-1-113(g)(3)(A). Appellants also appeal the trial court's determination that termination of their respective parental rights is in the children's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Ashley Preston, Nashville, Tennessee, for the appellant, Albert E. G.[1]

Sharlina Mack, Nashville, Tennessee, for the appellant, Katie G.

Herbert H. Slatery, III, Attorney General and Reporter, and Courtney J. Mohan, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

## OPINION

## I. Background

Albert E. G. ("Father") and Katie G. ("Mother") are the biological parents of the two minor children at issue in this case, Kaley G. (d/o/b/ June 2011) and Ellie G. (d/o/b April 2016) (together, the "Children"). On March 22, 2018, Appellee Tennessee Department of Children's Services ("DCS") received a referral alleging that: (1) Kaley was not attending school regularly; (2) the Children were outside unattended; (3) Mother and Father argued frequently and appeared to be using drugs; and (4) the home was "in unlivable conditions." In its investigation, DCS learned that Kaley had excessive absences from school. In the 2016/2017 school year, Kaley had a total of 25 absences. In the 2017/2018 school year, Kaley was absent from school a total of 35 times. In addition to educational neglect, DCS's investigation found that: (1) "there is ongoing reported drug use by both parents including IV drug use by the mother"; (2) "the children are out in the yard and road at all hours of the day and night, without supervision"; (3) "Ellie has an infected injury on her leg that she has not received medical care for"; (4) "there is ongoing reported domestic violence between the parents"; and (5) "the family's home is extremely cluttered and presents a safety hazard for young children."

On May 29, 2018, DCS filed a dependency and neglect petition requesting immediate custody of the Children "[d]ue to the risk of harm to the minor children due to their excessive truancy, medical neglect, exposure to ongoing domestic violence, lack of supervision, environmental neglect, and ongoing drug use along with the flight risk of the parents." The Juvenile Court for Davidson County ("trial court") placed custody with DCS; initially, DCS could not locate the Children. However, on June 11, 2018, Mother was arrested on drug-related charges, and Ellie was taken into custody at that time. A few weeks later, on June 26, 2018, DCS located and removed Kaley after she was found with Mother, "who was visibly under the influence." The delay in removing Kaley was caused by Father having physical custody of Kaley and actively avoiding DCS. Mother reported that Father hid Kaley from DCS until Mother was released from jail on the June 11 drug charges.

On March 29, 2019, the trial court entered an Agreed Order of Adjudication and Disposition, wherein it held that the Children were dependent and neglected due to the parents' use of illegal drugs, educational neglect, and domestic violence. The trial court's conclusion was based on the following facts as found in its March 29 order:

> 3. During interviews with the CPSI Jenczyk, the mother, Katie [G.], acknowledged a history of illegal drug use and acknowledged that she had "relapsed" by ingesting methamphetamines in February 2018. After the mother's arrest in June 2018 on drug related charges, the mother further acknowledged ingesting methamphetamines as recently as June 2018.

[Mother] further acknowledged domestic disputes between the mother and the father . . . in the presence of the children, that resulted in law enforcement response to the parties' home on multiple occasions. Law enforcement officers described the parents as "a public nuisance" due to the repeated responses by law enforcement to the family home. The mother further acknowledged that the minor child, Kaley [G.], had missed approximately 40 days of school in the current school year and was dropped from enrollment in April 2018 due to excessive absences.

4. During interviews with CPSI Jenczyk, the minor child, Kaley [G.], disclosed that she had witnessed violence between the parents on at least one occasion, on which occasion Kaley observed the mother and father arguing loudly and punching each other in her presence. Kaley further disclosed that she "just wanted her mother and father to stop fighting."

5. During interviews with the CPSI Jenczyk, the father, Albert [G.], denied many of the allegations contained in the referral but acknowledged that he was aware that the mother was using methamphetamines. [Father] acknowledged a history or illegal drug use but denied current use. However, [he] submitted to a drug screen and tested positive for methamphetamines. [Father] stated that his prescription medication could have resulted in a false positive for methamphetamine. CPSI Jenczyk confirmed with a pharmacist that such a false positive for that medication was in fact possible. [Father] has subsequently acknowledged that he is participating in alcohol and drug services during his incarceration to address issues related to his own more recent drug use.

6. During the pendency of this proceeding the parents have each been incarcerated in multiple counties in Tennessee, including but not limited to drug related charges. Most recently they were charged with the offense of car jacking in which incident the parents are alleged to be co-defendants. Those most recent charges of car jacking and aggravated robbery have been bound over to the Davidson County Grand Jury and remain pending as of the date of this Juvenile Court hearing. The parents each remain incarcerated on those charges as of the date of this Juvenile Court hearing

Turning to Mother and Father's criminal activity, on March 19, 2018, Mother was charged with driving on a suspended license. On August 19, 2018, she was charged with theft of property. On May 1, 2019, Mother pled guilty to both charges and was sentenced to ninety-days incarceration. She was released in July 2019, but was arrested again on August 22, 2019, when she missed a court date.

Mother and Father were both charged with aggravated robbery on July 14, 2018. Mother stated that the crime involved a vehicle they had "borrowed" that was later reported stolen, but she admitted that she and Father were using illegal drugs at the time. Father pled guilty to the charge on August 21, 2019 and was sentenced to six-years incarceration.

Mother pled guilty to the aggravated robbery and was initially sentenced to six-years incarceration. However, while incarcerated, Mother attended a drug-and-alcohol-treatment program and successfully petitioned the court for a suspended sentence. In November 2019, Mother was placed on probation for five years.

The conditions of Mother's probation required her to have a job, and to refrain from using drugs, possessing firearms, and criminal activity. Mother was required to submit to monthly drug screens. Although she was initially compliant with the drug screens, on March 1, 2021 (the first day of the hearing on the petition to terminate her parental rights), Mother tested positive for methamphetamine and amphetamines. The positive results were confirmed by a test administered on March 2, 2021 by Mother's probation officer. On April 15, 2021, during the termination of parental rights hearing, a warrant was issued for Mother's arrest due to her probation violation for the positive drug screen. Mother did not attend the last day of the hearing. Father did not participate at the hearing, and his whereabouts were unknown at that time. By order of August 30, 2021, the trial court terminated Mother's and Father's parental rights. Appellants appeal.

## II. Issues

We restate the dispositive issues as:

1. Whether there is clear and convincing evidence to support the trial court's termination of Mother's and/or Father's parental rights on any of the statutory grounds found by the trial court.

2. If so, whether there is clear and convincing evidence that termination of Mother's and/or Father's parental rights is in the Children's best interest.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent

- 4 -

serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also* ***Santosky v. Kramer***, 455 U.S. 745 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. ***Santosky***, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); ***In re Valentine***, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W.3d at 523-24 (citing ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010)); ***In re M.L.P.,*** 281 S.W.3d 387, 393 (Tenn. 2009); ***In re A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. ***In re M.L.P.***, 281 S.W.3d at 393 (quoting ***In re*** [***A.M.H.***], 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d at 246.

***In re Carrington H.***, 483 S.W.3d at 524. With the foregoing in mind, we turn to our review.

## IV. Grounds for Termination of Parental Rights

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent or guardian's parental rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d at 251 n.14. Here, the trial court terminated Mother and Father's respective parental rights on grounds of: (1) abandonment by an incarcerated parent by wanton disregard; and (2) and failure to manifest a willingness and ability to assume custody. The trial court also terminated Mother's parental rights on the additional ground of persistence of the conditions that led to the Children's removal. We now turn to address each of these grounds.

### A. Abandonment by an Incarcerated Parent by Wanton Disregard by Mother and Father

The trial court found, by clear and convincing evidence, that Mother and Father abandoned the Children. Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

As is relevant to this appeal, Tennessee Code Annotated section 36-1-102(1)(A)(iv) defines abandonment as follows:

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and [ ]:
>
> ***
>
> (c) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

This statutory provision "reflects the commonsense notion that parental incarceration is a strong indicator that there may be other problems in the home that threaten the welfare of

the child." ***In re Audrey S.***, 182 S.W.3d at 866. Incarceration itself does not satisfy the test for abandonment by wanton disregard; the court must find "by clear and convincing evidence that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." ***Id***. A "parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." ***Id***. "[P]robation violations, repeated incarcerations, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of the child." ***Id***. at 867-68.

The record supports the trial court's finding that both Mother and Father were incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action. The trial court also found, by clear and convincing evidence, that Appellants' criminal behavior, substance abuse, and general failure to support or supervise the Children constituted a wanton disregard for the welfare of the Children. The record supports this conclusion.

In the months immediately following the Children's removal to DCS custody, Mother and Father engaged in criminal activity. In 2018 and 2019, Mother was arrested and incarcerated in various Tennessee counties on charges of public intoxication, driving on a suspended license, violations of probation, possession of drugs without a prescription, and theft. In July 2018, Mother and Father were arrested on aggravated robbery charges. All of the foregoing criminal activity occurred while the Children were in DCS custody.

Concerning the conditions that existed at the time the Children were taken into custody, Mother candidly testified:

Q. What was your situation at the time Kaley and Ellie came into DCS custody?
A. Unstable.
Q. Unstable. Were you incarcerated?
A. Not at the time they came into custody.
Q. Did you become incarcerated shortly thereafter?
A. Yes.
Q. When you say unstable in July of 2018, what do you mean?
A. I just currently was in just a—there was a lot of things that had taken place, and I just wasn't sure what I wanted to do at that time in my life.
Q. Were you drug-free?
A. No, I wasn't.
Q. And what was your drug of choice during that time period?
A. Meth.

Q. Methamphetamine?
A. Yes.

Later in her testimony, Mother elaborated on the problems that led to the "unstable" environment that existed in the home when the Children were removed:

There was a lot of things going on at the time, I do know that. And [Father] was not doing well. Out of all what—that's why I left in April, so I'm sure that had something to do with it [i.e., Kaley's many absences from school].
Q. When you say you and [Father] weren't doing well, is that since there was domestic violence between the two of you?
A. Yeah, there was.
Q. And that domestic violence was in the presence of the children, correct?
A. Yes.
Q. Would you agree that the number of days that Kaley missed, the significant reason for that was you and [Father's] drug usage?
A. I would not say it was so much drug use. It was just a bad relationship all together and it wasn't—drugs didn't play the part of what—how that all came about, no. But, drugs did play its own part, so. . .
Q. It did play a part?
A. Yes.
Q. Okay.

DCS's investigation corroborated Mother's testimony. The Children were found to be in a state of neglect. They were unsupervised and allowed to roam the neighborhood at all hours. The home was dirty and in disarray. Neighbors stated that the Appellants engaged in fights in the yard, and these same neighbors suspected drug use. Both Mother and Father tested positive for methamphetamine. In fact, Ellie was removed from Mother when she was taken into custody for drug-related charges. Likewise, when Kaley was taken into custody, Mother was observed to be under the influence of drugs.

Although Father did not participate at the hearing, Mother's undisputed testimony clearly implicates him in the issues that were present in the household. As noted above, Father was using methamphetamine and was participating in the domestic violence. Furthermore, he was not supervising his children. Moreover, almost immediately after the Children were take into custody, Mother and Father engaged in an aggravated robbery of a vehicle, for which they both received a six-year sentence. From the totality of the circumstances, there is clear and convincing evidence to support the trial court's conclusion that Mother and Father engaged in behaviors that exhibited wanton disregard for the Children's welfare and ultimately culminated in the incarceration of both parents. As such, the record supports the trial court's termination of Appellants' respective parental rights on the ground of abandonment by an incarcerated parent by wanton disregard.

## B. Failure to Manifest a Willingness and Ability to
## Assume Custody by Mother and Father

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of parental rights when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

This ground for termination of parental rights requires the movant to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). Concerning the first element, DCS has the burden to prove that Mother and Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Children. Tenn. Code Ann. § 36-1-113(g)(14). The Tennessee Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set out in *In re Amynn K.*, No. E2017-11866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018); *see In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020) (citing *In re Amynn K.*, 2018 WL 3058280, at *14). The interpretation adopted by our Supreme Court

> places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing evidence that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah*, 2020 WL 7258044, at *14. If the first element is met, then DCS must show that placing the children in Mother's and/or Father's custody poses "a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). In this case, the trial court held that DCS met its burden of proof as to both of these elements vis-à-vis both parents. The record supports the trial court's conclusion.

Father did not participate in the hearing on the petition to terminate his parental rights. According to the testimony, he had no contact with DCS during the pendency of the case and did not make any financial contribution even after he was released from incarceration. At the time of the hearing, Father's whereabouts were unknown. His counsel

stated that the phone number she had for Father did not work, and despite attempts to locate Father, she had not been able to do so. There is no indication that Father has any intention to reunite with these Children.

The record shows that Mother has made attempts to see the Children and that she clearly wants to assume custody. The problem, however, is that Mother is not able to do so. Mother has been in and out of jail throughout the case. Although she has maintained periods of sobriety, she has never completed an intensive rehabilitation program, and has relapsed many times. On the first day of the hearing to terminate her parental rights, Mother tested positive for methamphetamine. After the positive test was confirmed the next day by her parole officer, a warrant was issued for Mother due to probation violation. Mother was absent on the last day of the hearing after being notified of the outstanding warrant.

In addition to the ongoing issues with drug abuse, Mother's current living situation is not stable. According to her testimony, she is currently living with her boyfriend, his Father and the Father's girlfriend, and another couple. Mother testified that she does not have a lease but explained that she pays monthly rent. When asked whether her boyfriend was involved in any criminal activity, Mother stated that "he was not the type." However, on the next day of hearing, DCS confronted Mother with the boyfriend's criminal record, showing that he had been charged with more than twenty-five crimes. Both parents have been in and out of jail throughout the case. Both parents have failed to pay any child support. For these reasons and more, it is clear that Father has failed to demonstrate a willingness to assume custody, and Mother has failed to demonstrate an ability to assume custody.

Turning to the second prong of this ground, i.e., that placing the children in Mother's and/or Father's custody poses "a risk of substantial harm to the physical or psychological welfare of the child[ren]," as discussed in further detail below, the record indicates that the Children have no meaningful relationship with the Appellants. The Appellants are presently unable to provide a stable, crime-free environment for the Children, and there is a question as to whether the Appellants will be able to maintain any level of sobriety. In foster care, the Children have made great strides. By all accounts, both Children are now well-adjusted and happy in their foster home, and the foster parents are anxious to adopt them. To place the children in the custody of either Appellant would clearly put them at risk of psychological and physical harm. As such, there is clear and convincing evidence to support the trial court's termination of Appellants' respective parental rights on this ground.

### C. Persistence of the Conditions that Led to the Children's Removal by Mother

The trial court also terminated Mother's parental rights under Tennessee Code

- 10 -

Annotated section 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

Turning to the record, it is clear that the issues that led to the Children's removal from Mother's home still persist. One of the primary issues was Mother's drug use. Based on her positive test for methamphetamine on the first day of the hearing, that issue still persists. Mother testified to her desire to be drug free, but her actions belie her intention. During the course of these proceedings, Mother has attempted to address her drug problems, but she has always relapsed.

- 11 -

Another issue that led to the Children's removal was the home environment. As discussed above, Mother's living situation has not stabilized during the course of these proceedings. She has lived in two half-way houses, then moved to Hendersonville to live with a male friend. At the time of the hearing, she was living in Hermitage with her paramour, who has a long criminal record. Mother, too, has accrued numerous criminal charges since the Children were removed from her custody. Although she was granted parole on her six-year sentence for aggravated robbery, based on the issuance of the warrant for her violation of parole, Mother has not taken the requirements of her parole seriously. As such, her living situation remains tenuous.

In view of the fact that these Children have been in DCS custody since 2018, and it is now 2022, it does not appear that Mother will be able to remedy the persistent conditions at any early date so as to make it safe for the Children to return to her care and custody. Meanwhile, the Children have done very well in foster care. By all accounts, they have adjusted and are now thriving in their environment. The foster father testified that Kaley, the older child, had a difficult transition into the foster home. Although she was only seven when she came into foster care, in many ways, Kaley acted like the parent of her younger sibling, Ellie. Kaley worried that Ellie would have enough to eat and would microwave hotdogs and attempt to prepare bottles for her younger sister. The foster parent also described Kaley as being "street-wise"—the child would attempt to leave the foster home at all hours to roam the neighborhood. When confronted, the child would say, "I can handle myself." From the foster father's testimony, Kaley has made great progress in relinquishing her former role as parent/guardian of her younger sister. She has become a child herself and enjoys playing with friends and doing other activities that are age appropriate. Kaley is also excelling in school both from an academic perspective and socially. Likewise, Ellie has flourished in the foster home. From the record, Ellie and Kaley needs are more than met in their current environment. The continuation of the parent/child relationship clearly diminishes the Children's chances of early integration into the safe, stable, and permanent home they have found with their foster parents, who are anxious to adopt them. From the totality of the circumstances, there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the Children's removal from her custody.

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Bernard T.*, 319 S.W.3d at 606 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793 at 809). As the Tennessee Supreme Court explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re*

*Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

***

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the

child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This list of factors is not exhaustive, nor does the statute "require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." ***In re M.A.R.***, 183 S.W. 3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Each termination of parental rights case includes different circumstances, and the consideration of a single factor or other factors outside those enumerated in the statute, may dictate the outcome of the best interest analysis. ***In re Audrey S.***, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s [ ] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

***White v. Moody***, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994). However, "[w]hen considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

In its order terminating Mother and Father's parental rights, the trial court made the following findings concerning the Children's best interests:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in the home of the parent or guardian;

Mother and Father have not made an adjustment of circumstances, conduct, or conditions so as to make it safe and in the children's best interest to be in the home of the Respondents. Mother and Father have made attempts and sought out services but have been unsuccessful in maintaining sobriety or stability. Based on these concerns and the unknown whereabouts of Mother and Father at the time of the last trial date, the children would not be safe if returned to the care of either parent.

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear

- 14 -

possible;

Mother and Father have failed to effect a lasting adjustment after receiving social services. Because Mother and Father's living situations are unstable and Mother is unable to maintain sobriety, it does not appear reasonably possible that a lasting adjustment will occur.

(3) Whether the parent or guardian has maintained regular visitation or other contact with the children;

Mother and Father have not maintained regular visitation or contact with the children. Mother and Father were unable to maintain visitation or contact due to their incarceration. However, upon release from incarceration, Mother has failed to maintain sobriety and Father has failed to contact DCS about the children. Mother currently has a warrant out for her arrest and Father's whereabouts are unknown.

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the children;

There is no evidence of a meaningful relationship established between either of the children and the parents. In therapy, Kaley has expressed anger towards her Mother and concerns of whether her Mother would seek employment. Ellie was only two years old when she entered foster care and has created strong bonds with her foster parents.

(5) The effect a change of caretakers and physical environment is likely to have on the children's emotional, psychological and medical condition;

A change of caretaker and physical environment is likely to have a negative effect on the children's emotional, psychological and/or medical condition. The children have been in their foster home for three years. They have bonded with the foster parents whom they love and who[] love them. They are thriving in their foster home and the parents wish to adopt them. In contrast, Mother and Father are in no position to provide an appropriate home for the children. The children have previously experienced trauma in the care of the parents and have been working on healing from the trauma. Removing them from their foster home where they are safe, secure, and well-adjusted would have devastating effects on the children.

***

(7) Whether the physical environment of the parent's or guardian's home is

- 15 -

healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the children in a safe and stable manner;

The Mother has relapsed and her substance abuse greatly impedes her ability to ensure a safe and healthy environment for the children. The safety of her housing with her current boyfriend and his family is unknown, as is the stability. Mother's paramour also has a history of criminal activity. Father's whereabouts are unknown at this time, so a safety and stability assessment is inapplicable. Furthermore, it is unknown if he has maintained sobriety since the last drug test several months ago. The children would not be in a safe and healthy environment if returned to either parent.

***

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101;

Mother and Father ha[ve] failed to pay child support and have abandoned the minor children to the foster care system.

Based on the above factors, the Court does find that it is in the best interest of the children for Father and Mother's rights to be terminated.

For many of the foregoing reasons, the record supports the trial court's finding that termination of Appellants' respective parental rights is in the Children's best interest. Father has not participated in these proceedings and has made no contact with DCS or with the Children directly. At the time of the hearing, his whereabouts were unknown. There is no indication that the Children have any real memory of him much less any meaningful relationship. Although Kaley knows her Mother, Mother testified that she has not seen Kaley since September 2020. Mother has not seen Ellie since August 2019. Given Ellie's age at the time she was removed from Mother, there is no meaningful relationship between Mother and Ellie. Mother has offered small gifts and toys for the Children, but has made no other financial contribution despite the fact that Mother has been employed in the periods where she has not been incarcerated.

Mother and Father have not made lasting adjustments to their lives so as to make it safe for the Children to be in their custody. Mother is still abusing drugs, and her criminal matters remain pending. She has not procured stable, crime-free housing. Father's current situation is unknown.

- 16 -

Meanwhile, the evidence shows that the Children are thriving in their current foster home. Both Children are bonded with the foster parents and with the foster parents' extended families. By all accounts, Kaley and Ellie are receiving all the stability, love, and care they need. Kaley is very social and excels in school. Ellie is happy and all of her needs are more than met. The foster parents clearly provide the structure, routine, care, and affection that these Children need. To remove them from their current placement would surely cause them emotional and psychological detriment. From the totality of the circumstances, there is clear and convincing evidence to support the trial court's finding that termination of Appellants' respective parental rights is in the Children's best interests.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating the parental rights of both Mother and Father. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to Appellant, Albert E. G., and one-half to Appellant, Katie G. Because both Albert E. G. and Katie G. are proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE